MARTA E. VILLACORTA (NY SBN 4918280)
Assistant United States Trustee
JASON BLUMBERG (CA SBN 330150)
Trial Attorney
JORGE A. GAITAN (CA SBN 288427)
Trial Attorney
United States Department of Justice
Office of the U.S. Trustee
280 South First Street, Ste. 268
San Jose, California 95113
Telephone: (408) 535-5525
Facsimile: (408) 535-5532
Email: jason.blumberg@usdoj.gov
           jorge.a.gaitan@usdoj.gov

Attorneys for Tracy Hope Davis,
United States Trustee for Region 17

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| In re:<br><br>**SVXR, INC., a Delaware corporation,**<br><br><br><br><br><br>Debtor. | Bankruptcy Case<br>No. 21-51050 SLJ<br><br>Chapter 11<br><br>Date: September 2, 2021<br>Time: 3:00 p.m.<br>Place: United States Bankruptcy Court<br>280 South First St.<br>San Jose, CA 95113-3099<br>Via Zoom |

**OBJECTION OF THE UNITED STATES TRUSTEE TO FINAL APPROVAL OF DEBTOR'S MOTION FOR DEBTOR IN POSSESSION FINANCING**

Tracy Hope Davis, United States Trustee for Region 17 (the "UST"), by and through her undersigned counsel, hereby files this objection to final approval of the *Debtor's First Day Emergency Motion Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, and 507, and Fed. R. Bankr. P. 2002, 4001, 6003, 6004, and 9014 for Entry of Interim and Final Orders: (I) Authorizing*

*the Debtor to (A) Obtain Senior Secured, Superpriority, Post-Petition Financing, and (B) Utilize Cash Collateral of Prepetition Secured Parties; (II) Granting Liens and Superpriority Claims; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief* (ECF No. 22) (the "DIP Financing Motion"). In support of her Objection, the UST respectfully represents as follows:

## I. INTRODUCTION

1. The DIP Lender[1] has obtained very favorable terms from the Debtor, including (i) an interest rate that could reach 19.75% (or more), and (ii) a 3.75% "make-whole fee" that the Debtor is virtually certain to incur.

2. Although debtors typically have little negotiating power, a court need not approve one-sided terms that convert the bankruptcy process into one that primarily benefits the lender. Here, the proposed DIP financing includes several provisions that appear to constrain the Debtor, a future chapter 7 trustee and creditors. Specifically,

    a. the DIP Collateral includes causes of action under Chapter 5 of the Bankruptcy Code ("Avoidance Actions") and their proceeds. Similarly, proceeds of Avoidance Actions would be subject to the DIP Lender's super-priority claim.

    b. events of default in the DIP Credit Agreement include the Debtor's mere filing of (i) a plan that does not pay the DIP Lender in full in cash on the effective date, (ii) a motion to obtain credit from a different lender, or (iii) a motion to dismiss or convert the case or for the appointment of a trustee. These events of default divest the Debtor of discretion in carrying out its fiduciary duties.

    c. a waiver of the estate's rights under 11 U.S.C. § 506(c) that is not limited to the period during which the Debtor may borrow funds.

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the DIP Financing Motion.

3. The Court will not ordinarily approve a financing with the aforementioned provisions. *See Guidelines for Cash Collateral & Financing Motions & Stipulations* (effective 1/1/2006) (the "Guidelines"), at ¶¶ E.4, E.5, and E.7.

4. The Debtor has not demonstrated that these provisions are necessary or appropriate in this case.

5. In fact, based on the expected sale price of the Debtor's assets ($11,858,000) and the amount of the Debtor's existing secured debt (approximately $8,725,000), there appears to be little risk that the DIP Lender will not be paid in full.

6. Further, the Budget and the Carve-Out do not adequately provide for payment of quarterly fees under 28 U.S.C. § 1930(a)(6). The Budget makes no explicit reference to quarterly fees, while the Carve-Out appears to be limited to fees payable before a "Carve-Out Trigger." The Carve-Out for quarterly fees should not be limited because the Debtor is statutorily required to pay quarterly fees under 28 U.S.C. § 1930(a)(6) and quarterly fees must be paid on or before a plan's effective date (11 U.S.C. § 1129(a)(12)).

7. For these reasons, the DIP Financing Motion should be denied, unless the DIP financing facility is modified to address the foregoing concerns.

## II. STATEMENT OF FACTS

### A. General Case Background

8. On August 4, 2021 (the "Petition Date"), the Debtor commenced a voluntary case under Chapter 11 of the United States Bankruptcy Code. *See* ECF No. 1. The Debtor is currently a debtor-in-possession under Sections 1107 and 1108 of the Bankruptcy Code. The Debtor is

3

Case: 21-51050    Doc# 84    Filed: 08/27/21    Entered: 08/27/21 09:55:32    Page 3 of 13

represented by Paul Hastings LLP.[2]  *See* Docket.  Daniel Trepanier was appointed as the Debtor's responsible individual under Local Bankruptcy Rule 4002-1 on August 11, 2021.  *See* ECF No. 53.

9. The meeting of creditors has been scheduled for September 7, 2021, at 10:00 a.m. *See* Docket.

10. Due to a lack of interest, no official committee of unsecured creditors has been appointed as of the date of this Objection.  *See* Docket.

11. On August 11, 2021, the Court entered an Order extending the Debtor's deadline to file its schedules and statements to August 27, 2021.  See ECF No. 54.  As of this Objection, the Debtor has not filed the required Schedules and Statements, including Schedule A/B, Schedule D, Schedule E/F and the Statement of Financial Affairs.  *See* Docket.

12. According to the declaration of Daniel Trepanier, the Debtor's Chief Executive Officer (ECF No. 26) (the "First Day Declaration"), the Debtor's existing secured debt totals approximately $8,725,000.  *See* First Day Declaration, at p. 8 of 26.[3]  Unsecured obligations total approximately $1,825,000.  *Id.,* at p. 10 of 26.

13. According to the First Day Declaration, the Debtor is a "developer and manufacturer of high-resolution, automated x-ray inspection … and metrology equipment for businesses in the semiconductor and advanced-electronics market."  *See* First Day Declaration, at p. 5 of 26.

---

[2]    An application to employ counsel has not been filed as of the date of this Objection.  *See* Docket.

[3]    The existing secured claims belong to (i) the SBA for a pre-petition EIDL loan, and (ii) second lien noteholders (many of whom are also equity holders).  *See* DIP Financing Motion, at p. 11 of 41; *see also* First Day Declaration, at pp. 8-9, 18 of 26.

B. **The Proposed Sale of the Debtor's Assets.**

14. On August 11, 2021, the Court entered an Order approving bidding procedures for the sale of the Debtor's assets. *See* ECF No. 57. The bidding procedures contemplated a bid deadline of August 20, 2021 and an auction (if necessary) on August 25, 2021. *See id.*, at p. 5 of 35.

15. On August 23, 2021, the Debtor filed a notice of cancellation of the auction. *See* ECF No. 76. The Debtor did not receive any qualified bids (other than the stalking horse bid). *Id.*

16. On September 2, 2021, the Court will consider the Debtor's motion for the sale of its assets to the stalking horse bidder (Bruker Nano, Inc., a competitor of the Debtor) for approximately $11,858,000. *Id.*; ECF No. 20 (bid procedures motion), at p. 9 of 197; ECF No. 28 (sale motion); First Day Declaration, at p. 17 of 26.

C. **The DIP Financing Motion**

17. As part of the DIP Financing Motion, the Debtor seeks approval of a debtor in possession credit facility in the aggregate amount of $2 million (the "DIP Financing"). *See* DIP Financing Motion, at pp. 12 of 41.

18. The DIP Lender is Legalist DIP GP, LLC. The DIP Lender has no pre-petition loans with the Debtor. *Id.*, at pp. 7, 17 of 42.

19. Salient terms of the DIP Financing include the following:

   a. the maturity date for the facility is not later than 4 months after the first draw. *See* DIP Financing Motion, at p. 12 of 41. Moreover, a sale of substantially all the Debtor's assets triggers a mandatory repayment obligation. *See* DIP Credit Agreement (ECF No. 22-3), at § 2.07(b).

   b. the interest rate for the DIP Financing ranges from a minimum of 15% to as much as 19.75% or more (if there is an event of default). *See* DIP Financing Motion, at pp. 12 of 41.

    c. the fees under the facility include (i) a 2% commitment fee, (ii) a 1.5% underwriting fee, and (iii) 3.75% "make-whole fee" if the facility is required to be repaid within the first two months. *See* DIP Financing Motion, at 21 of 41. By virtue of the proposed sale timeline, the Debtor seems likely to incur the "make-whole" fee. *See* DIP Credit Agreement (ECF No. 22-3), at § 2.07(b) (a sale of substantially all the Debtor's assets triggers a mandatory repayment obligation).

    d. the DIP Financing liens would prime the existing secured debt of the SBA and the secured noteholders. *See* DIP Financing Motion, at pp. 33, 35 of 41.

    e. The DIP Collateral includes Avoidance Actions and their proceeds. Similarly, proceeds of Avoidance Actions would be subject to the DIP Lender's super-priority claim under 11 U.S.C. § 364(c)(1). *See* DIP Financing Motion, at pp. 14, 25, 27 of 41; DIP Credit Agreement (ECF No. 22-3), at pp. 2, 7 of 15.

    f. there is a waiver of the estate's rights under 11 U.S.C. § 506(c). The waiver is not limited to the period during which the Debtor may borrow funds. *See* DIP Financing Motion, at p. 27 of 41.

    g. it is an event of default under the DIP Financing if the Debtor seeks to confirm a plan that does not pay the DIP Lender in full in cash on the effective date. It is also an event of default if the Debtor files (i) a motion to obtain credit from a different lender under 11 U.S.C. § 364, or (ii) a motion to dismiss or convert the case or for the appointment of a trustee. *See* DIP Financing Motion, at pp. 23-24 of 41; DIP Credit Agreement (ECF No. 22-3), at pp. 6-7 of 15 (§ 8.01(iii)(D), (E), (I), (J), (K), and (L), and (iv).

    h. there is a Carve-Out for, *inter alia*, statutory fees of the UST under 28 U.S.C. § 1930(a)(6) ("Quarterly Fees"). The Carve-Out is limited to fees "required to be paid … for the period up to the occurrence of a Carve-Out Trigger." *See* DIP Financing Motion, p. 27 of 41. In turn, a "Carve-Out Trigger" is defined as the occurrence and continuance of an event of default under the DIP Credit Agreement. *See* ECF No. 22-1, at p. 12 of 18.[4]

20. On August 11, 2021, the Court entered an order approving the DIP Financing on an interim basis. *See* ECF No. 58 (the "Interim Order"). The Interim Order authorized the Debtor to borrow up to $1 million. *Id.*, at p. 7 of 14.

---

[4] The Budget for the DIP Financing does not appear to include any amounts for the payment of Quarterly Fees. *See* ECF No. 44, at p. 5 of 5.

21. The Interim Order did not, however, grant the DIP Lender a lien on Avoidance Actions or a Section 506(c) waiver. *See* Interim Order, at p. 8 of 14 n.4. The Court will consider these and other provisions that are inconsistent with the *Guidelines for Cash Collateral & Financing Motions & Stipulations* (effective 1/1/2006) (*i.e.*, the "Guidelines") at the final hearing. *See* unnumbered docket entry dated August 10, 2021.

### III. OBJECTION

22. Before approving debtor in possession financing, a court must consider whether the terms of the proposed financing are fair, reasonable and adequate. *See In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312-13 (Bankr. D. Del. 2011).

23. In this respect, courts routinely consider the following factors: (i) whether the proposed facility is an exercise of the debtor's reasonable business judgment; (ii) whether the proposed facility is in the best interests of both the estate and its creditors; (iii) whether the transaction is both (a) necessary to preserve estate assets and (b) necessary and essential for the continued operation of the debtor's business; (iv) whether the terms of the proposed transaction are fair and reasonable given the circumstances; and (v) whether the proposed facility was negotiated in good faith and at arm's length. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003).

24. Courts recognize that debtors in possession often "enjoy little negotiating power." *See In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992). Thus, bankruptcy courts have not approved financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the sole (or primary) benefit of a post-petition lender. *See, e.g., Ames Dep't Stores, Inc.*, 115 B.R. 34, 38-39 (Bankr. S.D.N.Y. 1990) (*citing In re Tenney Vill. Co., Inc.*, 104 B.R. 562, 568 (Bankr. D.N.H. 1989) (holding that the terms of a post-

petition financing facility must not "pervert the reorganizational process from one designed to accommodate all classes of creditors . . . to one specially crafted for the benefit" of one creditor)).

25. Ultimately, the debtor bears the burden of proof when seeking financing under 11 U.S.C. § 364(c) and (d). *See, e.g., In re Tamarack Resort, LLC*, 2010 WL 4117459, at *9 (Bankr. D. Idaho Oct. 19, 2010) ("The DIP has the burden of showing that it was unable to obtain financing other than on a superpriority or priming basis.").

A. **Avoidance Actions Should not be Subject to the DIP Lender's Lien or Super-Priority Claim.**

26. As stated in the Guidelines, the Court "will not ordinarily approve" liens on avoidance actions. *See* Guidelines, at ¶ E.7.

27. Guideline E.7 is consistent with the purpose of avoidance actions; they exist for the benefit of all creditors, as opposed to any one particular creditor. *Cf. Off. Comm. of Unsecured Creditors v. Goold Elecs. Corp.*, 1993 WL 408366, at *4 (N.D. Ill. Sept. 22, 1993) ("[O]nly the trustee, acting on behalf of all the creditors, has a right to recover payments made as preferences."); *see also Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245, 250 (3d Cir. 2000) ("When recovery is sought under section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors …."); *In re Churchill Nut Co.*, 251 B.R. 143, 149 (Bankr. N.D. Cal. 2000) (The preference statue is intended to "discourag[e] a pre-bankruptcy race to the courthouse by creditors and facilitat[e] equality of distribution among creditors."). *But see In re Lahijani*, 325 B.R. 282, 288 (B.A.P. 9th Cir. 2005) ("under the law of the circuit, trustee avoiding powers may be transferred for a sum certain").

28. As discussed above, the DIP Lender seeks a lien on the Debtor's Avoidance Actions and their proceeds. Also, proceeds of Avoidance Actions would be subject to the DIP

Lender's super-priority claim under 11 U.S.C. § 364(c)(1). *See* DIP Financing Motion, at pp. 14, 27 of 41; DIP Credit Agreement (ECF No. 22-3), at pp. 2, 7 of 15. The Debtor has not demonstrated that these concessions are necessary or appropriate.

29. Based on the expected sale price of the Debtor's assets ($11,858,000) and the amount of the Debtor's existing secured debt (approximately $8,725,000), there appears to be little risk that the DIP Lender will not be paid in full. The risk is further ameliorated by (i) its request for a priming lien, (ii) the four-month maturity date for the DIP Financing, and (iii) the mandatory repayment obligation upon a sale. *See* DIP Financing Motion, at pp. 12, 33, 35, of 41; DIP Credit Agreement (ECF No. 22-3), at § 2.07(b).

30. Conversely, the expected distribution to unsecured creditors is unclear. Based on the expected sale price, there may be as much as $1,133,000 to pay to unsecured creditors (exclusive of administrative expenses not covered in the Budget). This amount is calculated as follows:

| Source / Use of Cash | Amount |
|---|---|
| Sale Price | $11,858,000.00 |
| *less* Secured debt | $8,725,000.00 |
| *less* DIP Loans | $2,000,000.00 |
| **Net Proceeds** | **$1,133,000.00** |

31. Because this amount is substantially less than the Debtor's estimate of unsecured claims ($1,825,000), the Avoidance Actions may be an important component of unsecured creditors' recovery in this case.

9

32. Consequently, the proceeds of Avoidance Actions should be maintained for the benefit of unsecured creditors. *See Off. Comm. of Unsecured Creditors v. Goold Elecs. Corp.*, 1993 WL 408366, at *4 ("The financing order is invalid to the extent that the order assigns to the bank a security interest in the debtor's preference actions."); *see also In re Qualitech Steel Corp.*, 276 F.3d 245, 248 (7th Cir. 2001) (agreeing that courts "do not favor using § 364 to give pre-petition lenders security interests in the proceeds of avoidance actions," but holding that the issue was moot because creditors did not seek a stay of the financing order); 3 *Collier on Bankruptcy* ¶ 364.06 (16th 2021) ("[B]ecause such liens encumber potentially-significant assets that would otherwise be available for the benefit of all unsecured creditors, the granting of the liens can be controversial.").

**B.    The Court Should Not Approve Financing Terms that Divest the Debtor of Discretion in Formulating a Plan and Administering the Estate.**

33. As stated in the Guidelines, the Court "will not ordinarily approve" provisions that "operate, as a practical matter, to divest the debtor in possession or trustee of any discretion in the formulation of a plan or administration of the estate or limit access to the court to seek any relief under other applicable provisions of law." *See* Guidelines, at ¶ E.5.

34. Guideline E.5 is consistent with a debtor in possession's status as a fiduciary for creditors and the estate. *Cf. In re Patel*, 621 B.R. 245, 254 (Bankr. E.D. Cal. 2020) ("The Debtors acted as fiduciaries in control of the estate during the period they were debtors in possession…. Thus, it commonly is said that a debtor in possession administers the estate as a fiduciary for the estate's creditors."); *see also* 11 U.S.C. §§ 704, 1106, 1107.

35. Here, the DIP Financing contains several provisions that divest the Debtor of discretion in administering the estate. Notably, it is an event of default under the DIP Financing if

the Debtor seeks to confirm a plan that does not pay the DIP Lender in full in cash on the effective date. It is also an event of default if the Debtor files (i) a motion to obtain credit from a different lender under 11 U.S.C. § 364, or (ii) a motion to dismiss or convert the case or for the appointment of a trustee. *See* DIP Financing Motion, at pp. 23-24 of 41; DIP Credit Agreement (ECF No. 22-3), at pp. 6-7 of 15 (§ 8.01(iii)(D), (E), (I), (J), (K), and (L), and (iv).

36.    The Debtor has not demonstrated that the inclusion of these events of default are necessary or appropriate. Thus, the events of default should not be approved. *Cf. In re Laffite's Harbor Dev. I, LP*, 2018 WL 272781, at *3 (Bankr. S.D. Tex. Jan. 2, 2018) ("[C]ourts look to whether the proposed terms would prejudice the powers and rights that the Code confers for the benefit of all creditors and leverage the Chapter 11 process by granting the lender excessive control over the debtor or its assets as to unduly prejudice the rights of other parties in interest."); *In re Latam Airlines Grp. S.A.*, 620 B.R. 722, 820 (Bankr. S.D.N.Y. 2020) (denying DIP financing motion, because equity subscription feature "dictate[d] key terms of an eventual plan of reorganization"); *In re Tenney Vill. Co., Inc.*, 104 B.R. at 568-69 (holding that debtor's execution of DIP financing agreement violated its fiduciary obligations to the estate, where, among other things, it was a termination event if a plan was confirmed over the lender's objection).

C.    **The Section 506(c) Waiver Should be Limited to the Period for Which the Debtor May Borrow Funds.**

37.    As stated in the Guidelines, the Court "will not ordinarily approve" waivers under 11 U.S.C. § 506(c), unless the waiver is "effective only during the period in which the debtor is authorized to use cash collateral or borrow funds. (Otherwise a future trustee might be faced with a duty to care for and preserve collateral in the trustee's possession and no financial means for discharging that duty."). *See* Guidelines, at ¶ E.4; *see also* 3 *Collier on Bankruptcy* ¶ 364.06 (16th

11

Case: 21-51050    Doc# 84    Filed: 08/27/21    Entered: 08/27/21 09:55:32    Page 11 of 13

2021) ("[R]estrictions on surcharge are generally treated as 'extraordinary' provisions and may be disputed to the extent they are perceived as unfairly shifting the costs of preservation of the lender's collateral to unsecured creditors.").

38. The Debtor has not demonstrated the basis for requiring unsecured creditors to bear the cost of preserving the DIP Collateral after the DIP Lender's lending obligations terminate. Any Section 506(c) waiver should, thus, be limited to the period during which the Debtor may borrow funds. *Cf. In re The Colad Grp., Inc.*, 324 B.R. 208, 224 (Bankr. W.D.N.Y. 2005) ("By its language, section 506(c) speaks only to the payment of reasonable and necessary costs. This court can discern no basis to allow a secured creditor to ignore its application."); *McAlpine v. Comerica Bank-Detroit (In re Brown Brothers, Inc.)*, 136 B.R. 470, 474 (W.D. Mich. 1991) (holding that a section 506(c) waiver is unenforceable "in light of the congressional mandate that a trustee have the authority to use a portion of secured collateral for its preservation or proper disposal").

D. **The Carve-Out for Quarterly Fees Should not Be Limited to Fees Payable before a "Carve-Out Trigger."**

39. As discussed above, the Carve-Out for Quarterly Fees is limited to fees "required to be paid … for the period up to the occurrence of a Carve-Out Trigger." *See* DIP Financing Motion, p. 27 of 41. A "Carve-Out Trigger" is defined as the occurrence and continuance of an event of default under the DIP Credit Agreement. *See* ECF No. 22-1, at p. 12 of 18.

40. Based on the foregoing, it is possible that Quarterly Fees may accrue for disbursements made prior to a "Carve-Out Trigger," but such fees may only become payable after the occurrence of a Carve-Out Trigger. The Carve-Out for Quarterly Fees should not be limited because the Debtor is statutorily required to pay Quarterly Fees under 28 U.S.C. § 1930(a)(6) and Quarterly Fees must be paid on or before a plan's effective date (11 U.S.C. § 1129(a)(12)).

12

Case: 21-51050    Doc# 84    Filed: 08/27/21    Entered: 08/27/21 09:55:32    Page 12 of 13

41. Thus, the Carve-Out with respect to Quarterly Fees should not be limited to fees payable before the "Carve-Out Trigger."

## IV. CONCLUSION

**WHEREFORE**, the UST respectfully requests that this Court sustain the Objection and deny the DIP Financing Motion, unless the DIP Financing is modified to address the UST's concerns as set forth herein, including with respect to (i) the requested lien on Avoidance Actions and their proceeds, (ii) events of default that divest the Debtor of discretion in fulfilling its fiduciary duties, (iii) the requested waiver of rights under 11 U.S.C. § 506(c), and (iv) the scope of the "Carve-Out" with respect to Quarterly Fees.

Dated: August 27, 2021

TRACY HOPE DAVIS
UNITED STATES TRUSTEE

By: /s/ Jason Blumberg
Jason Blumberg
Trial Attorney for the United States Trustee